UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICK CHARLES ALLEN, AA4729,

         Petitioner,

    v.

CONNIE GIPSON, Warden,

         Respondent.

Case No.  12-cv-03769-CRB

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

       Petitioner Patrick Charles Allen, a state prisoner incarcerated at Solano State Prison, seeks a writ of habeas corpus under 28 U.S.C. § 2254 invalidating a conviction and sentence from Alameda County Superior Court.  Per order filed on May 25, 2018, after two stays to allow Petitioner to return to state court to exhaust new claims, this Court found that the operative Amended Petition (dkt. #71) merited an answer from respondent as to why a writ of habeas corpus should not be granted.  Respondent has filed an answer (dkt. # 12) and petitioner has filed a traverse (dkt. #75)

## BACKGROUND

A.    <u>Statement of the Case</u>

       Petitioner was charged by information with murder with the personal use of a firearm and the personal infliction of great bodily injury; possession of a firearm by a felon; and one prior felony conviction.

       On November 13, 2008, Petitioner pleaded guilty to possession of a firearm by a felon.

       On December 8, 2008, a jury in the Alameda County Superior Court convicted Petitioner of first degree murder and found true the personal use of a firearm allegation.

       On June 26, 2009, the Alameda County Superior Court sentenced Petitioner to 50 years to life imprisonment.  The California Court of Appeal affirmed Petitioner's conviction on January

14, 2011, and the California Supreme Court denied a petition for review on September 12, 2012.

On July 12, 2012, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  On July 26, 2012, the California Court of Appeal denied the petition.

On July 31, 2012, Petitioner filed a petition for review in the California Supreme Court. On September 12, 2012, the California Supreme Court denied the petition.

Petitioner filed a petition for writ of habeas corpus in this Court on July 18, 2012.  He then filed a petition for stay and abeyance pending exhaustion in the state courts, and this Court granted that petition on October 23, 2012.

On July 17, 2013, Petitioner filed a petition for writ of habeas corpus in state trial court. The trial court denied that petition without prejudice on September 16, 2013.

On November 20, 2013, Petitioner filed a habeas petition in the California Court of Appeal. The California Court of Appeal denied that petition on December 6, 2013.

On December 30, 2013, Petitioner filed a habeas petition in the California Supreme Court. The California Supreme Court denied that petition on June 25, 2014.

Petitioner moved to lift the federal stay, and this Court granted the motion and issued an order to show cause on August 21, 2014.   On February 9, 2015, this Court dismissed some of Petitioner's claims and ordered respondent to file an answer.

On March 11, 2015, Respondent answered the petition, and the Court ordered that the traverse be filed by April 20, 2015. Petitioner requested, and this Court granted, several extensions of time to file the traverse.

On February 29, 2016, Petitioner filed a motion to substitute his attorney due to a conflict of interest.  This Court granted the motion on April 19, 2016, and new counsel was appointed to represent Petitioner on April 28, 2016.

 On January 10, 2017, this Court granted Petitioner's motion to stay federal proceedings pending exhaustion of an additional claim in the California Supreme Court.

On March 1, 2018, Petitioner filed a habeas petition to exhaust that claim in the California

2

Supreme Court.

On May 23, 2018, the California Supreme Court denied the state habeas petition. On May 25, 2018, this Court lifted the stay and ordered Petitioner to file this amended petition by July 6, 2018.

On July 6, 2018, Petitioner filed the operative Amended Petition.

B.    Statement of the Facts

The California Court of Appeal summarized the facts of the case as follows:

In 2000, when appellant's sister S.A.[1] was 14 years old, and appellant was 16, S.A. was raped and impregnated by the husband of a woman for whose children S.A. had been babysitting. S.A. reported the crime to the police and talked to appellant about it, but as far as S.A. and appellant were aware, no criminal investigation was pursued. S.A. reluctantly chose to terminate the pregnancy. After the rape, S.A. was uncomfortable around men, and found it difficult to be touched by them.

Both S.A. and appellant were very traumatized by this event, and appellant promised S.A. that he "would never let anything like this happen to [S.A.] again." When appellant was 18 years old, he told other participants in a youth leadership development program that S.A.'s rape was one of the worst things that had happened to him.[2]

Starting sometime in 2002, S.A. moved into the home of her best friend, Dorothea Atkins (Dorothea, also called Dottie). Dorothea lived with her infant daughter in the home of her parents, Robert Atkins, Sr. (Robert Sr.) and Irene Atkins (Irene).[3] The father of Dorothea's baby did not live with them; Dorothea's mother had met the man, but was not aware that he had ever visited the Atkins home. The Atkins home also housed Dorothea's brother Robert Atkins, Jr. (Robert Jr., also called Ducky), who was an 18-year-old college football player. S.A. got along with the Atkins family well, and although she had occasional arguments with Robert Jr., they were friendly most of the time, and never had a physical fight.

Appellant had been to the Atkins home, and had met Dorothea and Irene, but did not know Robert Jr., and had never met the father of Dorothea's baby. S.A. told appellant that the father of Dorothea's baby was a drug dealer, about 30 years old, who lived near the Atkins family home.

---

[1]   To protect the privacy of appellant's sister, we will refer to her by her initials.

[2]   The significance of appellant's statement during the youth leadership development program is discussed in more detail *post,* in connection with appellant's contentions regarding the trial court proceedings after his conviction.

[3]   Several members of the Atkins family testified at appellant's trial. These individuals all share a surname, so to avoid confusion, and meaning no disrespect, we will use first names to refer to them.

In 2003, while S.A. was living with the Atkins family, appellant was convicted of possession of marijuana for sale. As of February 2005, appellant was still making his living as a drug dealer, and kept a gun in his car for protection.

On February 27, 2005, Robert Jr. was watching television in the living room of the Atkins family home. He left briefly to go to the kitchen, and when he returned, found that S.A. had changed the channel. Robert Jr. and S.A. then got into an argument over the remote control. Irene, who was in bed in another room, heard giggling and laughing at first, but then heard S.A. call to her that she would "'call the police if he puts his hands on me.'" Irene did not think S.A. was being serious, and told her that Robert Jr. had the remote first.

According to S.A., Robert Jr. was often disrespectful to the women in the Atkins household, and his demand for the remote control upset S.A. because, as she later realized, she perceived it as a way of trying to exercise power or control over her. During the argument, Robert Jr., who was much bigger than S.A., grabbed S.A.'s wrist, lifted her hands over her head, held them there for what was probably about a minute, but felt to S.A. like a long time, and pushed her onto the couch. After that, S.A. returned to her bedroom, which she shared with Dorothea and the baby. Because of Robert Jr.'s actions in physically overpowering her, S.A. felt that something "snapped," and she could not stop crying or calm down.

Dorothea, who had been out grocery shopping, returned to find S.A. in tears. Irene told Dorothea that S.A. and Robert Jr. had gotten into an argument in Dorothea's absence. Dorothea then went to her and S.A.'s shared bedroom, where S.A. told her that Robert Jr. had put his hands on her, and that she wanted to leave the Atkins home permanently and return to that of her own family. Dorothea helped S.A. pack up her things, and told Irene she would take S.A. home, but soon changed her mind because she did not want to leave the baby. Dorothea then told S.A. to call her brother (i.e., appellant) to get a ride.

S.A. called appellant at 10:43 a.m., and spoke to him for 29 seconds. According to both S.A. and appellant, she was crying during the call. S.A. testified that she told appellant that "Dottie's brother Ducky put his hands on me" and that she wanted appellant to come pick her up.[4] Appellant testified that he heard what S.A. said to him as "Dottie's baby daddy put his hands on me"; thus, he was under the impression that the person about whom S.A. was complaining was the father of Dorothea's baby, rather than Dorothea's brother. Appellant also explained that he was unsure whether "put his hands on me" meant the man simply slapped S.A., or sexually assaulted her, but he thought they probably had just had a fight.

Before receiving S.A.'s call, appellant had started his day by smoking marijuana and drinking cognac. He described himself as having been "high" by

---

[4]     According to Dorothea's testimony at appellant's trial, she heard S.A. tell appellant during the phone call that S.A. and Dorothea's brother had "just got into it."   Shortly after Robert Jr. was killed, Dorothea told a police officer that what S.A. told appellant was that that Robert Jr. had "put his hands on her."   At trial, she explained that S.A. did not tell appellant that until after appellant arrived at the Atkins home.

10:00 a.m. Upon receiving S.A.'s call, he drove to the Atkins home, but parked around the comer so that no one would see him go to the trunk of his car, retrieve his gun, and put it in his pocket. He said he took the gun with him because he "didn't know what to expect."

Appellant knocked on the front door of the Atkins home, and Robert Sr. let him in, having learned from Irene that appellant would be coming to pick up his sister. Robert Jr. was still sitting on the couch watching television when appellant arrived. Appellant greeted Robert Sr. and Irene nicely and politely, and went to the doorway of S.A. and Dorothea's shared bedroom. Dorothea described appellant's demeanor at this time as calm, and not upset or agitated. Appellant admitted greeting Dorothea's parents politely; he averred that he was in fact upset at the time, but was not showing it.

When appellant reached the threshold of the bedroom, he asked S .A. what had happened. According to S.A., she was still unable to stop crying, but she managed to tell appellant again that "Dottie['s] brother put his hands on me," and pointed at the couch. According to appellant, S.A. did not respond verbally, but just burst into tears. When S.A. entered the living room, appellant asked her "Which one was it?" or "Where is he?," and S.A. pointed to Robert Jr.

Appellant testified that at this time; he still was under the impression that the man to whom S.A. pointed was the father of Dorothea's baby, whom he understood to be a bad person, rather than Dorothea's brother. He also still was unsure whether the man had just fought with S.A., or sexually assaulted her. He was starting to think it must have been a sexual assault, however, because S.A.'s face did not look as though anyone had hit her, and no one in the house explained to him why S.A. was crying.

According to Robert Sr., who was in the living room, appellant politely asked Robert Jr. to step outside with him to talk. Irene and Dorothea testified that appellant asked Robert Jr., "Can I holler at you, man?" Irene averred that appellant said this in a calm tone of voice and with a calm demeanor; similarly, Dorothea said he spoke quietly. The two young men then left the house, followed by S.A. According to S.A., neither appellant nor Robert Jr. raised their voices before or after they left the house.

Appellant testified that when he and Robert Jr. left the house, he suspected, but still was not sure, that S.A. had been sexually assaulted. When S.A. emerged from the house, he asked her again what happened, but she kept on crying and did not answer. At this point, because S.A. was so distraught, and was behaving the same way she had when she told appellant about her rape, appellant became convinced that the man who had come outside with them (who he still thought was Dorothea's baby's father) had raped or sexually assaulted her. He testified that as a result, he was overcome with a flood of emotions, was "out of control," and "wasn't thinking." Appellant then fired his gun at Robert Jr.; kept firing until he ran out of bullets; and ran to his car and drove away. At his trial, appellant admitted on cross-examination that the shooting was, as the prosecutor put it, "an excessive response to the situation [appellant] found [him]self in."

Irene heard the shots a few seconds after the young men went outside, and ran to a window, from which she could see Robert Jr. lying on the ground and

5

appellant shooting him. Robert Sr. also heard the shots, as well as Irene's screams. He went outside, saw appellant standing over Robert Jr., and asked appellant what he was doing. Appellant did not respond, but ran away, still holding the gun. S.A. was standing nearby. She said something to appellant before he ran away, but Robert Sr. was not sure whether she said "I told you not to do that"; "I didn't tell you to do that"; or "Why did you have to do that?" S.A. testified that at the time, she only screamed. She explained that she said "I didn't tell him to do that," but this was a little later, and she was addressing Robert Sr.

At 10:59 a.m., the Oakland Police Department received a 911 call about the shooting. When the police arrived, they found Robert Jr. lying on the ground outside the Atkins home. Irene explained to them what had happened. The autopsy confirmed that Robert Jr. died from multiple gunshot wounds that had caused fatal damage to his heart and lungs. Six bullets were recovered from the body. Appellant hid the gun in a trashcan outside the home of his friend Walter Abram. After obtaining false identification, appellant traveled to several other states, and to Mexico, where he was arrested while crossing the border into Texas in late May 2005. In June 2005, while appellant was in jail awaiting trial, the police stopped a car in which Abram was a passenger. A passerby told the police that a gun had been thrown from the car, and another witness saw a gun on the shoulder of the highway where the police had first tried to pull the car over. Forensic testing later determined that the gun was the one appellant used to kill Robert Jr.

Appellant was charged with murder, with allegations of personal use of a firearm, personal infliction of great bodily injury, and possession of a firearm by a felon. Just before trial, appellant pleaded guilty to the charge of firearm possession by a felon. The jury found appellant guilty of first degree murder, and found the firearm use allegation true. Appellant's motion for new trial was denied, and he was sentenced to 50 years to life in prison.

People v. Allen, No. A125439, slip op. at 2–6 (Cal. Ct. App. Jan. 14, 2011) (dkt. #26-3)

(footnotes in original) [hereinafter "People v. Allen"].

## DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

B.    Claims

Petitioner raises several claims for relief under § 2254: (1) one of the California model jury instructions used in Petitioner's case, CALCRIM No. 570, violated Petitioner's constitutional rights to a jury trial, to present a defense, and to due process of law; (2) the trial court's

7

supplemental instruction in response to a question posed by the jury during deliberations violated Petitioner's constitutional rights to a jury trial, to present a defense, and to due process of law; (3) trial counsel's failure to object to the trial court's supplemental instruction or to request re-instruction denied Petitioner the effective assistance of counsel; (4) trial counsel's failure to investigate and present evidence supporting the heat of passion defense denied Petitioner the effective assistance of counsel; (5) trial counsel's failure to object to prosecutorial misconduct during closing argument denied Petitioner the effective assistance of counsel; (6) appellate counsel's failure to raise a claim of prosecutorial misconduct denied Petitioner the effective assistance of counsel on appeal; (7) appellate counsel's failure to raise a claim of instructional error denied Petitioner the effective assistance of counsel on appeal; and (8) appellate counsel's failure to raise a claim challenging the denial of Petitioner's new trial motion on his Petition for Review to the California Supreme Court denied Petitioner the effective assistance of counsel on appeal.

The claims may be categorized under three general types of habeas claims — instructional error, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel — and will be addressed within the established frameworks of these types of claims.

1.  Instructional Error

Petitioner raises two claims for relief based on instructional error: (1) CALCRIM No. 570 as given incorrectly stated California law; and (2) the trial court's supplemental instruction in response to a jury question was error.

In reviewing a habeas claim based on instructional error, the reviewing court must inquire "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the constitution." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Boyde v. California, 494 U. S. 370, 380 (1990)). To obtain federal habeas relief for error in the jury charge, petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Id. The error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. In other words, the court must

evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir.1988).

In addition, Petitioner must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence on the jury's verdict, before the court may grant federal habeas relief. Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

a. CALCRIM No. 570

Petitioner alleges that CALCRIM No. 570, as given, "erroneously stated that provocation is legally adequate to reduce murder to voluntary manslaughter only if it 'would' have caused a reasonable person to act from passion and not from judgment." Am. Pet. at 16. According to Petitioner, provocation under California law is adequate to reduce murder to voluntary manslaughter if it was likely to cause a reasonable person to act from passion — that is, if it could have had such a result. Id. at 16–17.

The edition of CALCRIM No. 570 that was read at Petitioner's trial stated as follows:

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

The defendant killed someone because of a sudden quarrel or in the heat of passion if:

1. The defendant was provoked;

2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

AND

3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, this is, from passion rather than from judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation

9

and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition <u>would</u> have been provoked and how such a person <u>would</u> react in the same situation knowing the same facts.

If enough time passed between the provocation and killing for an ordinary person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

Am. Answer (dkt. #72) at 10–11 (emphasis added in Answer).

The California Court of Appeal rejected Petitioner's claim that CALCRIM No. 570 was inadequate, finding that, even if each "would" used in the instruction should have been replaced with "could," the error was "harmless beyond a reasonable doubt." <u>People v. Allen</u>, slip op. at 10. The California Court of Appeal's rejection was not contrary to, or an unreasonable application of, clearly established Supreme Court Precedent. <u>See</u> 28 U.S.C. § 2254(d).

This Court notes at the outset that Petitioner's claim that CALCRIM No. 570 improperly stated California law is not a cognizable federal habeas claim under § 2254 because it is well established that federal habeas relief does not lie in a state court's violation of state law. <u>See</u> <u>Estelle</u>, 502 U.S. at 71–72 ("the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1029 (9th Cir. 2005) (errors in state law cannot form basis for federal habeas relief). Only Petitioner's claim that CALCRIM No. 570 violated his rights to a jury trial, to present a defense, and to due process of law is a cognizable federal habeas claim under § 2254.

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

But Petitioner cites no clearly established Supreme Court precedent prohibiting an instruction using "would" instead of "could" to explain the objective prong of the provocation defense to murder.  Nor does he show how the alleged instructional error "so infected the entire trial that the resulting conviction violates due process."  See Estelle, 502 U.S. at 72.

This Court finds that there is no reasonable likelihood that the jury applied CALCRIM No. 570 in a way that violates due process.  The use of "would" when describing the objective prong of the heat of passion defense does not so alter the provocation standard that the jury would have misapplied the law.  See id.  The distinction of whether a person of average disposition "would" have acted without judgment or "could" have acted without judgment does not raise the provocation standard to an unconstitutional plane.  Regardless of the word used, the objective prong of this defense is asking the jury to speculate on whether a person of average disposition might have acted rashly under the same circumstances that Petitioner was in.  Because it is unknowable whether every single reasonable person would have acted rashly under Petitioner's circumstances, there will always be an element of speculation when the jury makes this kind of determination.  The difference in the scope of the speculation inherent in determining whether a reasonable person "would" or "could" act a certain way, if there is any, is not of such a scale as to cast doubt upon the fairness of the trial as a whole.

Even if this Court assumes, without deciding, that Petitioner can meet his burden under Estelle of showing that the use of CALCRIM No. 570 carried a reasonable likelihood that the jury applied the challenged instruction in a way that violates Petitioner's constitutional rights, Petitioner has not shown that he was actually prejudiced by such error.

Petitioner has not shown how the mere changing of the words "would" to "could" throughout the jury instructions had a substantial and injurious effect or influence on the jury's verdict.  See Brecht, 507 U.S. at 637.  The only evidence that Petitioner presented at trial to support his provocation defense is his own testimony.  People v. Allen, slip op. at 11.  Petitioner testified about the effect that his sister's rape had on him, and about the flood of emotion with which he was overcome upon learning that another man had "put his hands on" her.  Id. at 5, 11–

11

12. But the prosecution brought evidence, including Petitioner's own admission, that Petitioner parked his car away from the victim's home, obtained a gun from the trunk of that car, walked the distance from his car to the victim's home, calmly entered the home, saw that his sister was still in tears, calmly asked the victim to step outside, and shot the victim with every bullet in his gun. The jury was entitled to disregard Petitioner's testimony regarding his mental state at the time of the shooting, and to find, based on the evidence presented by the prosecutor, that Petitioner did not kill under the heat of passion and was guilty of first degree murder.

### b. The trial court's supplemental instruction in response to a jury question

Petitioner claims that the trial court's response to a question posed by the jury violated his constitutional right to due process. Petitioner described the question and response as follows:

> Within an hour of commencing deliberations, the jurors submitted a request for "[f]urther clarification between criteria for deciding 1st Degree Murder or 2nd Degree Murder." After conferring with counsel, the trial court responded: "Murder requires malice aforethought, which may be either express or implied. Your instructions define those terms. [¶] If the murder was deliberate and premeditated, as defined by the instructions, it is of the first degree. [¶] All other murders are of the second degree. [¶] Is there some additional specific guidance the court can provide that is not contained in the instructions you already have?"

Am. Pet. at 18.

The response to the jury's question was not constitutional error because the trial court merely responded to the question asked and referred the jury back to the instructions given, which included instruction on provocation. The jury specifically asked about the difference between first degree murder and second degree murder. It did not ask about provocation or about voluntary intoxication. The trial court then responded by reiterating that murder requires malice aforethought. If the murder was deliberate and premeditated, the court went on, it is first degree murder. If it was not deliberate and premeditated, but still had the element of malice aforethought, it was second degree murder. This response addressed precisely the clarification sought in the question.

The California Court of Appeal rejected Petitioner's claim on the ground that he did not show prejudice from the trial court's response. People v. Allen, slip op. at 8–9. This Court

12

United States District Court
Northern District of California

agrees. Petitioner has not shown that the trial court's response had a "substantial and injurious affect" on the jury's verdict in large part because there is nothing substantially noteworthy about the response. See Brecht, 507 U.S. at 637. As noted above, the court merely responded to the question posed and referred the jury back to the entirety of the instructions already given. The response was innocuous.

There is no colorable argument that the verdict likely would have been different if the court had referred the jury specifically to CALCRIM Nos. 522 (provocation can reduce murder to manslaughter) and 625 (voluntary intoxication can influence the mens rea element to murder), as Petitioner suggests. That the jury posed a question on the difference between first degree murder and second degree murder may suggest that the jury was only considering those two options at that time. It is entirely possible that the jury had foreclosed the possibility of finding voluntary manslaughter, and instead was deciding only on whether to find Petitioner guilty of first degree murder or second degree murder.

Regardless, this Court is satisfied that federal habeas relief is not in order based on this claim because the California Court of Appeal's rejection of the claim was not objectively unreasonable. See 28 U.S.C. § 2254(d).

  2. <u>Ineffective Assistance of Counsel at Trial</u>

Petitioner raises three claims for relief based on ineffective assistance of counsel at trial: (1) trial counsel's failure to object to the trial court's response to a jury question amounted to ineffective assistance; (2) trial counsel's failure to investigate and present evidence supporting the heat of passion defense amounted to ineffective assistance; and (3) trial counsel's failure to object to prosecutorial misconduct amounted to ineffective assistance.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). A meritorious claim for ineffective assistance lies where counsel's conduct so undermined the proper functioning of the adversarial

13

process that the trial cannot be relied upon as having produced a just result.  Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must show (1) that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, id. at 687–88, and (2) that Petitioner was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

To meet Strickland's first prong, a petitioner must show that counsel's performance was deficient; that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Id. at 687.  To do this, a petitioner must show that counsel's representation fell below an objective standard of reasonableness.  Id. at 688.  The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny of a counsel's performance is highly deferential, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Strickland, 466 U.S. at 689 (citation omitted).  The purpose of the Sixth Amendment's effective assistance guarantee is not to improve the quality of legal representation, but simply to ensure that criminal defendants receive a fair trial.  Id.  Therefore, a review of ineffective assistance claims must find counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," as opposed to "second-guess[ing] counsel's assistance after conviction or adverse sentence."  Id. at 686.

Strickland's second prong requires a petitioner to show that counsel's errors were so serious as to deprive the defendant of a fair trial, in which the result is reliable.  Strickland, 466 U.S. at 688.  To show prejudice, a petitioner must demonstrate that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694. Where a petitioner is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'" Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 695).

When analyzing ineffective assistance of counsel claims under the § 2254(d), a federal habeas court employs a doubly deferential standard. Cullen v. Pinholster, 563 U.S. 170, 189–90 (2011); Knowles v. Mirzayance, 556 U.S. 111, 112 (2009). For a federal habeas court reviewing a state court's determination, the pivotal question is not whether defense counsel's performance fell below the Strickland standard, but whether the state court's application of the Strickland standard to that performance was reasonable. Harrington v. Richter, 562 U.S. 86, 100–01 (2011).

a. Trial counsel's failure to object to the trial court's response to a jury question

Petitioner claims that his trial counsel was ineffective for failing to object to the trial court's response to a jury question. Petitioner's claim fails because he has not shown that counsel's failure to object was unreasonable, or that he was prejudiced by it.

To succeed under the first prong of the Strickland ineffective assistance of counsel standard, Petitioner must show that his trial counsel's performance was deficient. Petitioner has not shown that counsel's conduct fell outside of the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689. In fact, for the reasons discussed in Part 2(b) supra, it is entirely reasonable that an attorney in Petitioner's trial counsel's position could have thought that an objection to the trial court's response would have been overruled. Petitioner's trial counsel knew that the jury had been instructed on the heat of passion defense, that counsel had already given a closing argument on that defense, and that the jury had not asked a question about that defense. Under those circumstances, a reasonable lawyer could easily have thought the objection Petitioner now seeks was not worth bringing.

15

Perhaps most importantly, Petitioner has not shown that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. As discussed, Petitioner can only speculate that the verdict rendered would have been different if the trial court made the change that Petitioner claims was necessary. Petitioner is not entitled to federal habeas relief on this claim because the state court's rejection of the claim cannot be said to be an objectively unreasonable application of Strickland. See 28 U.S.C. § 2254.

Because Petitioner has not shown that his trial counsel's performance was deficient for failing to object to the trial court's response to the jury question, and because he has not shown prejudice from that failure, Petitioner's claim fails.

### b. Trial counsel's failure to investigate and present evidence supporting the heat of passion defense

Petitioner claims that his trial counsel failed to investigate and present evidence supporting the heat of passion defense. Specifically, Petitioner points to his trial counsel's failure: (1) to find a videotape of Petitioner discussing the emotional toll his sister's rape had on him at a youth development program in 2002; and (2) to investigate and present mental health expert testimony regarding Petitioner's cognitive ability at the time of the murder. Because these two grounds have different procedural histories, this Court addresses each piece of evidence separately.

### i. Videotape

Petitioner alleges his trial counsel failed to investigate a videotape which purported to show Petitioner telling his youth development program that his sister's rape was "the worst thing that ever happened to him." Am. Pet. at 22. According to Petitioner, he and his family told Petitioner's trial counsel about the existence of a videotape that showed Petitioner making this statement. Id. Petitioner's family provided his trial counsel with a videotape that purportedly contained the relevant footage, but an inspection of the videotape revealed no such statement. Id. Thus, trial counsel "concluded that no such footage existed and did not investigate further." Id. Later, trial counsel discovered that another person had possession of the correct

16

1  videotape.  Id. at 23.

2         Petitioner's claim fails because he does not show that counsel's performance was deficient.

3  When assessing whether trial counsel's failure to continue to investigate, a reviewing court cannot

4  let the benefit of hindsight cloud its judgment; it must view the facts and circumstances as known

5  to the trial counsel at the time of trial.  Thus, this court cannot let the fact that the correct videotape

6  may have been discovered after the opportunity to present it at trial had passed cloud its judgment.

7  The relevant question is whether it was unreasonable for trial counsel to cease pursuit of the

8  videotape evidence after discovering that the videotape Petitioner's family gave her did not

9  contain the relevant footage.  It was not.

10        It is entirely reasonable that a lawyer could conclude, based on the absence of the relevant

11 statement on the videotape that her client gave her, that the desired footage did not exist.  And

12 even if it did exist, counsel could reasonably have concluded that the statement regarding the

13 effect of his sister's rape on him was cumulative of Petitioner's testimony at trial.

14        Petitioner also fails to show that he was prejudiced by his trial counsel's performance.  The

15 California Court of Appeal found that the inability to show the correct videotape at trial did not

16 prejudice Petitioner:

17               As evidence of appellant's state of mind at the time of the shooting, the
   videotape was cumulative, as well as remote in time. No matter how powerful
18             the videotape may have been, it simply is not probable that viewing it would
   have altered the jury's assessment that the circumstances leading to appellant's
19             shooting of [the victim] did not constitute provocation legally sufficient to
   reduce the degree of appellant's crime. This is particularly true in light of
20             appellant's own admission that his reaction to the circumstances was
   excessive.
21

22 People v. Allen, slip op. at 15.  The state court was addressing the videotape in the context of a

23 review of the trial court's denial of Petitioner's motion for a new trial, but referred to this

24 determination in finding that Petitioner was not prejudiced by his trial counsel's failure to find the

25 correct video before the end of trial.  Id. at 17.  This Court agrees.  Because the videotape footage

26 was cumulative of Petitioner's own testimony and remote in time from the offense, it simply

27

28                                            17

cannot be said that there is a reasonable probability that, but for trial counsel's failure to locate and introduce the video footage, the result of the proceeding would have been different. <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

Petitioner is not entitled to federal habeas relief on this claim because he has not shown that trial counsel's performance was deficient or that it prejudiced him.

ii. <u>Expert Testimony</u>

Petitioner claims that his trial counsel was ineffective for failing to investigate and present mental health expert testimony at trial. Respondent argues that the claim is procedurally barred, but this Court need not decide whether it is because the claim is without merit.

Petitioner alleges that he was suffering peritraumatic dissociation (sometimes called a "dissociative state") at the time of the offense. This assertion arises out of a declaration made by Dr. Karen Franklin, a forensic psychologist. Petitioner's counsel retained Dr. Franklin in 2015 to conduct a "limited case review" regarding whether "Mr. Allen might have been overwhelmed with emotion at the moment he shot [the victim]." Am. Pet., Ex. A at 2. Dr. Franklin described her investigation as follows:

> In conducting my analysis, I reviewed several documents provided to me by Ms. Covin. These included a "factual summary" written her [sic], the transcripts of trial testimony of Patrick Allen and his sister, Spice Allen, a letter from Mr. Allen's trial attorney, William DuBois, to the presentencing probation officer (to which was attached a letter from an individual named Macheo Payne, and letters from Mr. Allen to his sister and to the victim's mother.
>
> On November 23, 2015, I met with Mr. Allen in a private room at Solano State Prison for a period of approximately 3.25 hours. I collected information from him regarding his history and the circumstances of the offense.

<u>Id.</u> As a result of her investigation, Dr. Franklin stated that she could have testified at Petitioner's trial that "there is a reasonable possibility that he was in a dissociative state at the time of the offense." <u>Id.</u> at 7.

Dr. Franklin's declaration is not enough to establish prejudice under the second prong of the <u>Strickland</u> framework. First, Dr. Franklin herself notes that this declaration is only

speculative.  As she puts it: "[o]nly Mr. Allen can know with certainty whether he was actually in such a dissociative, 'trance-like' state at the time of the offense."  Id.  Further, she does not state that, based on her investigation, there is a probability or likelihood that Petitioner suffered from peritraumatic dissociation; only that it is possible.  Second, Petitioner has not shown that expert testimony such as Dr. Franklin's could not be rebutted.  If Petitioner's trial counsel had called a mental health expert to testify, the prosecution could have done the same, or could have delivered an effective cross examination to discredit the defense's expert.

To show prejudice, Petitioner must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  See Strickland, 466 U.S. at 694.  He does not.  Here, the jury found enough evidence of malice aforethought, premeditation, and deliberation to convict Petitioner of first degree murder.  The declaration of a forensic psychologist almost eleven years after the date of the offense about the "possibility" that Petitioner was in a dissociative state is not enough to demonstrate a reasonable probability that the outcome of the trial would have been different had this testimony been introduced.

Petitioner is not entitled to federal habeas relief on this claim because he has not shown that he was prejudiced by his trial counsel's failure to investigate and present mental health expert testimony.

### c.  Trial counsel's failure to object to prosecutorial misconduct

Petitioner claims that trial counsel was ineffective for failing to object to prosecutorial misconduct during the closing argument.  The claim is without merit because Petitioner has not shown prejudice from the prosecutor's comments at closing.

The gravamen of Petitioner's claim is that the prosecutor gave a closing argument based on CALCRIM No. 570, which Petitioner argues misstated California law.  So, according to Petitioner, the prosecutor's comments also amounted to a misstatement of California law.  But as already discussed, the instructions did not rise to the level of constitutional error, or prejudice

Petitioner.

The California Court of Appeal addressed the prosecutor's statements in the context of Petitioner's claims of instructional error. It stated:

> We need not determine whether appellant's argument is correct, because even assuming for the sake of argument that the instruction should have been modified, we are convinced, given the record in this case, that any error was harmless beyond a reasonable doubt. We reach this conclusion for several reasons. First, the prosecutor clarified in closing argument that what is required is not that "everybody would" be caused to act rashly, or that "absolutely that's the same thing I would do if I was [sic] in that situation," but rather whether the provocation "probably would have caused a person of average disposition to . . . act rashly"—that is, whether it is "possible" that a person of average disposition "would . . . have acted in a similar fashion." Appellant's trial counsel stressed the same point in his own closing argument. Thus, to the extent that the word "would" in the instruction was ambiguous, as appellant argues, both counsel made it clear to the jury that the intended meaning was the one advocated by appellant. (See People v. Bordelon (2008) 162 Cal.App.4th 1311, 1321–1322 [in determining whether there is reasonable likelihood that jury understood instruction in manner complained of on appeal, reviewing court considers not only language of instruction at issue, but also arguments of counsel].)

People v. Allen, slip op. at 10 (footnote omitted). Put simply, the state court found that the prosecution's comments did not amount to a misstatement of California law or prejudice Petitioner. This Court agrees.

Petitioner has not shown that there is a reasonable probability that, had trial counsel objected to the prosecutor's comments, the objection would have been sustained and the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. Petitioner is not entitled to federal habeas relief on this claim.

3.    Ineffective Assistance of Counsel on Appeal

Petitioner raises three claims for relief based on ineffective assistance of counsel on appeal. He alleges: (1) counsel's failure to raise a claim of prosecutorial misconduct during argument amounted to ineffective assistance; (2) counsel's failure to raise a claim of instructional error amounted to ineffective assistance; and (3) counsel's failure to challenge the denial of Petitioner's new trial motion in the California Supreme Court amounted to ineffective assistance.

20

United States District Court
Northern District of California

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391–405 (1985).[5] Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in <u>Strickland</u>, 466 U.S. 668 (1984). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. <u>Smith</u>, 528 U.S. at 285; <u>Moormann</u>, 628 F.3d at 1106. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. <u>Smith</u>, 528 U.S. at 285–86; <u>Moormann</u>, 628 F.3d at 1106.

It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. <u>See</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 751–54 (1983); <u>Gerlaugh v. Stewart</u>, 129 F.3d 1027, 1045 (9th Cir. 1997); <u>Miller</u>, 882 F.2d at 1434 n.10. "[T]he weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." <u>Miller</u>, 882 F.2d at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for having declined to raise a weak issue. <u>Id.</u>

### a. Appellate counsel's failure to raise a claim of prosecutorial misconduct

Petitioner claims that his appellate counsel was ineffective for failing to raise a claim of prosecutorial misconduct on appeal. The claim is virtually indistinguishable from his claim of ineffective assistance of trial counsel for failure to object to prosecutorial misconduct, and is similarly without merit.

First, Petitioner has not shown that his appellate counsel acted unreasonably in failing to

---

[5] Although the right to the effective assistance of counsel at trial is guaranteed to state criminal defendants by the Sixth Amendment as applied to the states through the Fourteenth, the Sixth Amendment does not address a defendant's rights on appeal; the right to effective state appellate counsel is derived purely from the Fourteenth Amendment's due process guarantee. <u>See</u> <u>Evitts</u>, 469 U.S. at 392.

21

bring this claim. It is noteworthy that Petitioner did not cite to any case law or other sources of standard appellate practice that support a finding that counsel acted unreasonably in failing to raise this issue. See Smith, 528 U.S. at 285. Regardless, it was entirely reasonable for appellate counsel to have assessed this claim as one not worth raising. See Jones, 463 U.S. at 751 (stating that no Supreme Court precedent has held "that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."). As noted earlier, the claim was not one with much of a likelihood of success on appeal.

Second, Petitioner has not shown that he was prejudiced by counsel's failure. To succeed under the second prong of the Strickland test, Petitioner must show that there is a reasonable probability that counsel would have succeeded if they brought the claim at issue on appeal. See Smith, 528 U.S. at 285–86. The California Court of Appeal's decision instead suggests that the claim would have been rejected on appeal. That court specifically referenced the statements of the prosecutor in holding that there was no instructional error. See People v. Allen, slip op. at 10. Petitioner is not entitled to federal habeas relief on this claim.

b.  Appellate counsel's failure to raise a claim of instructional error

Petitioner claims that his appellate counsel was ineffective for failure to raise a claim of instructional error on appeal. This Court notes at the outset that the instructional error claim at issue — CALCRIM No. 570 — was raised appeal to the California Court of Appeal, so the claim is facially moot. See People v. Allen, at 9–11. But even if this Court construes this claim as asserting that counsel brought the instructional error claim ineffectively, it fails because Petitioner has not proffered any argument that would have succeeded on appeal. In order to succeed on a claim of ineffective assistance of counsel on appeal, a petitioner must show not only that their appellate counsel was unreasonable for failing to bring a meritorious issue, but also that there is a reasonable probability that they would have prevailed had that claim been raised. Smith, 528 U.S. at 285–86. Because Petitioner did not proffer any iteration of this argument that would probably

22

have succeeded on appeal, there is no latitude for this Court to find that Petitioner's counsel was ineffective. Petitioner is not entitled to federal habeas relief on this claim.

### c. Appellate counsel's failure to challenge the denial of Petitioner's new trial motion in the California Supreme Court

Petitioner cursorily claims that appellate counsel was ineffective for failing to challenge the denial of his new trial motion in his petition for review to the California Supreme Court. This claim is without merit.

Petitioner brought a motion for new trial after he discovered the videotape discussed in Part 2.b.i. The trial court denied that motion, finding that the videotape did not constitute new evidence as required under the applicable California law, was cumulative, and was unlikely to cause a different result at a new trial. See People v. Allen, at 14–15. The California Court of Appeal reviewed this denial under the applicable abuse of discretion standard, and found that "[t]he trial court's reasoning was fully consonant with the applicable legal standards." Id. at 15.

It simply cannot be said that it was unreasonable for appellate counsel to think that raising this claim in his petition for review to the California Supreme Court would have made his petition less persuasive. Nor can it be said that there is a reasonable probability that Petitioner would have prevailed had counsel brought the claim to the California Supreme Court in his petition for discretionary review. See Smith, 528 U.S. at 285–86. Petitioner is not entitled to federal habeas relief on this claim

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. And pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because it cannot be said that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

///

///

**IT IS SO ORDERED**.

Dated: October 24, 2018



CHARLES R. BREYER
United States District Judge